# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ALLISON CARGILE, )
) No. 16 C 4176
Plaintiff, )
)
v. )
) Magistrate Judge Sidney I. Schenkier
NANCY A. BERRYHILL, Acting )
Commissioner of the U.S. Social )
Security Administration,[1] )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff Allison Cargile ("plaintiff" or "Ms. Cargile") seeks judicial review under 42 U.S.C. § 405(g) of a final decision of defendant Commissioner of the Social Security Administration ("SSA") denying her request for waiver of overpayment of social security benefits. *See* 42 U.S.C. §§ 404(a). After an Administrative Law Judge ("ALJ") denied the request for waiver, Ms. Cargile filed a timely request for review of the ALJ's decision with the Appeals Council. The Appeals Council denied review, and plaintiff sought review in federal court. Addressing cross-motions for summary judgment, the district court remanded the case to the Commissioner for further proceedings. *Kainer-Cargile v. Colvin*, No. 11 C 7435, 2013 WL 5587084 (N.D. Ill. Oct. 10, 2013). The Appeals Council in turn remanded the case to a different ALJ for further proceedings consistent with the district court's ruling (R. 400). Following two hearings and the receipt of additional evidence, on December 11, 2015, the ALJ denied

---

[1]On January 23, 2017, Nancy A. Berryhill became Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), the Court has substituted Ms. Berryhill for Carolyn W. Colvin as the named defendant.

[2]On May 13, 2016, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 7).

plaintiff's request for waiver (R. 148-154). Ms. Cargile declined to file exceptions to the decision with the Appeals Council, making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.984(d) ("If no exceptions are filed and the Appeals Council does not assume jurisdiction of your case, the decision of the administrative law judge becomes the final decision of the Commissioner after remand").

Before the Court is plaintiff's brief in support of remanding her case (doc. # 15) and the Commissioner's motion for summary judgment seeking to affirm the Commissioner's decision (doc. # 22). Ms. Cargile contends that the ALJ erred in denying her request that the SSA waive its claim for overpayments, because she was not at fault for causing the overpayment and requiring repayment would defeat the purposes of the Social Security Act (doc. # 15: Pl. Brief, at 7-15). For the reasons that follow, plaintiff's request for remand is granted and the case is remanded to the SSA for further proceedings consistent with this opinion.

## I.

Ms. Cargile is deaf. She received (a) Disabled Adult Child Insurance Benefits ("DAC") based on the earnings record and social security number of her father, who died in 1998;[3] and (b) Disability Insurance Benefits ("DIB"), for which she filed based on her own disability in 1997 (R. 30-32). Thereafter, Ms. Cargile began working in 2000. She earned $5,814.45 in 2000, $14,811.97 in 2001, $19,619.17 in 2002, $21,229.37 in 2003, $23,214.66 in 2004, and $13,844.64 in 2005 (R. 67).

The record contains five letters from the SSA addressed to plaintiff dated between November 1, 2001 and November 2, 2003 (R. 33-45). The November 1, 2001 letter, sent to Ms. Cargile at a Texas address and listing both Ms. Cargile's and her deceased father's social security numbers, "increased the benefit amount on [Ms. Cargile's] own record because [she]

---

[3]Ms. Cargile's application for DAC benefits is not in the record, but that of her brother is (R. 99-101).

had additional earnings," and decreased the benefit the SSA paid Ms. Cargile on her father's Social Security record (R. 33). The letter explained the breakdown of the monthly payment of benefits: $792.00 on plaintiff's account and $571.00 on her father's social security number (*Id.*). The letter informed plaintiff of her right to appeal if she disagreed with the SSA's decision (*Id.*).

On April 20, 2002, the SSA sent plaintiff a letter addressed to her in North Aurora, Illinois (R. 35-37). Listing only Ms. Cargile's social security number, the letter states that it was providing "information about the disability benefits which you receive on this Social Security record"; specifically, that thereafter she would receive monthly checks in the amount of $642.00 (R. 35). Two months later, in a letter dated June 16, 2002, addressed to Ms. Cargile in North Aurora and again citing only plaintiff's social security number, the SSA wrote to her "about the disability benefits which you receive on this Social Security record" (R. 38). The letter stated that she would receive payments of $920.00 each month beginning in June 2002 (*Id.*). The fourth letter, dated July 29, 2002, was addressed to plaintiff at a new address in Aurora, Illinois, and simply noted that checks would be sent to the financial institution Ms. Cargile selected and requested that Ms. Cargile tell the SSA if she changed her mailing address or financial institutions or accounts where her payments were to be deposited (*Id.*).

The final letter from the SSA to plaintiff during this time period was dated November 2, 2003 (R. 43-45). Citing solely plaintiff's social security number, the SSA wrote that it "raised the monthly benefit beginning January 2002 to give you credit for your December 2001 earnings" on this account (R. 43). The letter stated that plaintiff would receive a check for $1,962.00 for money she was due through October 2003, and then would receive scheduled payments of $1,004.00 for November 2003 and every third of the month thereafter (*Id.*).

The SSA next sent a letter to Ms. Cargile in the latter half of 2006.[4] In response to this letter, the record contains transcripts of telephone calls Ms. Cargile made to SSA offices attempting to "straighten out" her Social Security issues.[5] During her first call, plaintiff communicated with Ms. Faulkner (R. 14-17). Ms. Faulkner stated that plaintiff's disability payments should have terminated as of March 2004 because her gross monthly earnings were well over the monthly amount that the SSA allows (R. 14-15). Plaintiff responded that she and her mother had been told for years that it did not matter how many hours she worked because she was receiving her father's benefits, but that things would change when she got married (R. 15). Ms. Cargile had learned only a few months earlier — when she called SSA to let them know she got married — that it was her earnings, and not her marital status, that mattered (*Id.*). She felt "just totally lost on what ssi expects" (*Id.*). Ms. Faulkner explained that the SSA would discontinue benefits payments and seek repayment for the amount they overpaid since April 2004, but that Ms. Cargile could request a waiver for that overpayment (R. 16-17).

Plaintiff next called the SSA on November 7, 2006, and communicated via TDD with Lillian (R. 18). Plaintiff explained that she was confused about what was going on with her benefits because she was being told many different things, and after having been told that her benefits would end in October, she still received a November deposit into her bank account (*Id.*). After looking up her account, Lillian told plaintiff that she was receiving Social Security benefits of $1,072.00 per month (*Id.*). Plaintiff stated that she thought that she was not supposed to be receiving benefits and that there must be "some screw up somewhere" because the SSA suspended her account and said that she had been overpaid (*Id.*). Plaintiff asked if she needed to

---

[4]The record does not include this letter from the SSA to plaintiff, but plaintiff referenced the letter in her subsequent telephonic communications with the SSA.

[5]Because she is deaf, plaintiff's telephone calls are made via a text telephone system ("TDD") (Pl.'s Brief for SJ, at 3; R. 14-18, 24-26). The actual date of this first TDD call is not set forth on the document.

physically go to an SSA office to talk to someone about the status of her benefits, but Lillian assured Ms. Cargile that she did not need to go into an SSA office and nothing "need[ed] to be straightened out" because Ms. Cargile's benefits were not being suspended (*Id.*).

Less than two weeks later, in a letter dated November 20, 2006, the SSA informed plaintiff that it had paid her $66,535.50 too much in benefits between July 2001 and April 2004 (R. 47). The letter stated that plaintiff "should refund this overpayment within 30 days" (R. 48). The letter further explained that plaintiff had the right to appeal and to request a waiver from repaying the overpayment (*Id.*).

Plaintiff filed a request for waiver of repayment on November 28, 2006 (R. 53-60). Plaintiff met with an SSA representative on December 14, 2006, and explained that she had always been told that marriage, not her wages, would affect her receipt of social security benefits (R. 62). On February 10, 2007, the SSA found Ms. Cargile was at fault for the overpayment because she never reported her work (R. 68-69). The February 10 report cites both plaintiff and her father's social security numbers under "claim number," and notes that the author "believe[d]" that the work review was initiated when plaintiff reported her marriage in 2006 (R. 69).

## II.

Following the denial of her waiver request, plaintiff requested a hearing before an ALJ (R. 85). On January 9, 2008, Ms. Cargile, her husband, Kevin Cargile, and a friend, John Gilbert, testified at a hearing before an ALJ (R. 112-144). After the ALJ informed her of her right to an attorney, plaintiff explained that she tried to get one, but was unable to do so (R. 115). The ALJ continued with the hearing (*Id*).[6] The ALJ asked plaintiff "what type of social security benefits were you receiving when this overpayment occurred," to which plaintiff responded she was

---

[6]The ALJ asked "[d]o you wish to go ahead without one? Have you had a chance to look through this file?" (R. 115). Ms. Cargile answered, "[n]o" (*Id.*). The ALJ then proceeded with the hearing.

"guessing" the disability benefits on her father's account (R. 116-117). When asked by the ALJ what her understanding was that caused the "huge overpayment," Ms. Cargile testified that the first time she learned that her work income affected her receipt of disability payments was when she called the SSA to inform them of her upcoming wedding in two months; before that, she believed that only getting married would stop her disability payments (R. 118-121). Plaintiff stated that she did not know that working and earning money was inconsistent with receiving disability benefits; she believed she was receiving disability "based off of my father's income and I don't hear" (R. 124).

The ALJ stated that he could not find plaintiff's "application . . . filed on September 15th, '97" and instead referred to her brother's DAC application filed on November 30, 1998 (R. 124-125). The ALJ pointed out that the form states: "I agree to promptly notify the Social Security Administration if any of the following events occur and to promptly return any benefit check I receive to which a child is not entitled," including if "a disabled child age 18 or over goes to work . . . ." (R. 125). The ALJ stated that Ms. Cargile was overpaid because she did not notify the SSA when she started working; if the SSA had been aware that she was working, it would have stopped her disability checks (R. 126). Plaintiff responded that she did not know that she had to report her earnings or that her earnings affected her benefits; otherwise, she would have reported it (*Id.*). She reported her income every year to the IRS (R. 127-128).

Plaintiff's husband then testified that based on plaintiff's checks fluctuating—going down when she worked a year full time and then going up when she went part time— he thought that the SSA must know how much she was earning (R. 130), and until 2006, Ms. Cargile was never informed otherwise (R. 132).

6

On January 25, 2008, the ALJ issued a decision denying Ms. Cargile's waiver request (R. 9-11). The ALJ noted that Ms. Cargile testified that "all she understood was that her benefits would stop if she got married," and that she and her husband "insisted that they were not aware of the need to report earnings until they called about the marriage" (R. 10). In a single sentence of analysis, the ALJ stated that he read to plaintiff and her husband from her brother's DAC application to show the standard language about the need to report earnings from work after age 18 that is contained in all such applications (R. 10-11). The ALJ then found plaintiff should have known to report earnings from work when receiving benefits based on disability after age 18, and was therefore not without fault in causing or accepting the overpayment (R. 11).

Ms. Cargile requested review from the Appeals Council and following denial of the request, on October 19, 2011, Ms. Cargile filed a civil action in the United States District Court for the Northern District of Illinois (11 C 7435) (R. 167-172). On October 10, 2013, the district court granted plaintiff's motion to remand, finding fault with the ALJ's decision on four grounds: (1) the ALJ based his holding that Ms. Cargile had notice of a duty to report on statements in her brother's application, and there was no evidence that plaintiff ever saw any such notice; (2) while summarizing the hearing testimony, the ALJ did not make a credibility finding; (3) the ALJ failed to mention the TDD phone communication transcripts; and, (4) the ALJ gave no consideration to the fact that Ms. Cargile is deaf. *Kainer-Cargile v. Colvin*, 11 C 7435, 2013 WL 5587084, at *4-5 (N.D. Ill. Oct. 10, 2013).

### III.

Following remand from the District Court, plaintiff, represented by counsel, appeared before a different ALJ for a hearing on October 16, 2014 (R. 402-433). Ms. Cargile testified that she had no memory of ever going into a Social Security office or filling out her 1997 DIB

application (R. 411). Plaintiff received all of her benefit checks throughout the years by direct deposit (R. 411-412). Throughout the course of receiving benefits she moved at least six times and notified the SSA through TDD calls about the address changes (R. 412-413). During these TDD calls, plaintiff was never asked if she worked or earned any income (R. 414).

The ALJ noted that in other overpayment cases before her, individuals reported that they received an annual form asking them to list any address changes, number of children, current work status, and other general information (R. 422). Plaintiff testified that she could not recall if she ever received that type of form, but insisted that "[she] wouldn't have throwed [*sic*] it out if [she] would have gotten something" (*Id.*). Plaintiff also affirmed that her understanding was that the benefits she received were under her father's account (R. 422-424). At the time of the second hearing, plaintiff was not working, but her husband was working (R. 419).

Subsequent to the October 16, 2014 hearing, plaintiff received a letter stating that the ALJ had obtained a copy of plaintiff's original DIB application dated September 5, 1997, and was entering it into the record (R. 325-326). Plaintiff requested a supplemental hearing (R. 275), which was granted. On August 18, 2015, plaintiff, represented by counsel, appeared again before the ALJ (R. 436-461). At the beginning of that hearing, the ALJ noted that she had "confirmed with some of [the SSA's] senior staff" that plaintiff's application to the SSA was a DIB application (R. 437-438). The ALJ also reviewed a letter the SSA sent to plaintiff on April 14, 2006, which stated that plaintiff was taking part in a "ticket to work program" effective December 17, 2005 (R. 439). The ALJ could not find the reporting requirements for the ticket to work program from that time period (R. 440).

The ALJ presented Ms. Cargile with a copy of her September 1997 DIB application (R. 446). Plaintiff confirmed that the document contained her signature but she did not remember

8

having signed it (*Id.*). In September 1997, plaintiff was in college, unmarried, and had no kids (R. 446-447). The ALJ noted that the application states that the applicant agrees to notify the SSA if the individual goes back to work as an employee or self-employee (R. 452). There was no DAC application from plaintiff in the record, but plaintiff's counsel pointed out that certain letters from the SSA to Ms. Cargile referenced both her and her father's social security numbers as the basis for her receiving benefits (R. 452-53).

The ALJ then asked what Ms. Cargile would be able to repay on a monthly basis if she was found at fault for the overpayment (R. 453). Plaintiff testified that they "definitely can't afford $500 a month. I mean what's reasonable, I mean $50 a month. I mean if that's what we have to do, then – I'd rather not but- -" (R. 458-459). Plaintiff testified that she was currently a stay-at-home mom and had not worked since June 2010 (R. 454). Her husband made around $6,000.00 per month and their total expenses were about $7,200.00 per month (R. 454-457). They had about $10,000.00 in credit card bills and were considering a change in residence because they could no longer afford the real estate taxes on their house (R. 458).

On December 11, 2015, the ALJ issued a decision finding that plaintiff was overpaid benefits in the amount of $66,535.50 during the periods July 1, 2001 to August 2001 and December 1, 2001 to October 1, 2006 (R. 149). The ALJ further found that Ms. Cargile was at fault in causing the overpayment "as she did not notify the SSA when she started to work" (R. 151). The ALJ determined that plaintiff was informed of her duty to report work activity based on: (1) wording in the application she signed when she first applied for DIB benefits in 1997; and, (2) the Ticket to Work letter addressed to plaintiff, dated April 14, 2006 (R. 151-152).[7]

---

[7]The Ticket to Work letter is not in the record but was attached to plaintiff's brief; the parties agree that we may consider it (Pl.'s Br. at 10 n.3). We note the ALJ states the Ticket to Work letter was dated April 6, 2006, but the letter submitted by plaintiff as an exhibit to her opening brief is dated April 14, 2006. The letter also bears a stamp stating it was received in Aurora, Illinois on March 28, 2007.

The ALJ then addressed each of the district court judge's concerns in *Kainer-Cargile*, 2013 WL 5587084, stating: (1) "even without the claimant's DAC application, there was sufficient documentation that indicated the claimant had reason to understand she had a duty to report more than her marriage"; (2) regarding credibility, the ALJ noted the "consistency of the claimant's testimony" that she was obligated only to report when she was getting married, but found that "there was no objective evidence that supported the claimant's assertions"; (3) the ALJ disagreed with the district court's assessment that the TDD transcripts corroborated plaintiff's testimony at her first hearing, stating there was no evidence that plaintiff was told by a representative that she did not have to report work activity; and, (4) with regard to the fact that claimant is deaf, the ALJ stated that "[i]t is reasonable to assume the claimant had contact with hearing individuals daily, but there was no evidence that suggested she had difficulty interacting with customers, co-workers, or supervisors when she was working" in a bank, and she stated she stopped working to stay home with her children, not because she was deaf (R. 152-153).

### IV.

In cases reviewing the final decision of the Commissioner, the ALJ's decision will be upheld if it is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Meuser v. Colvin*, 838 F.3d 905, 910 (7th Cir. 2016). Evidence is substantial when it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)) (internal quotation marks omitted). The reviewing court must consider all evidence on the record; however, it may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th

Cir. 2012). The ALJ "must identify the relevant evidence and build a 'logical bridge' between the evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014).

Ms. Cargile has not challenged the ALJ's findings that she was overpaid benefits, or the amount of the overpayment (R. 405). There is also no dispute that the SSA may waive the recovery of an overpayment only if: (1) the recipient is without fault in causing the overpayment; and (2) recovery either defeats the purpose of the Social Security Act or goes against equity and good conscience. *See* 42 U.S.C. § 404(b)(1); 20 C.F.R. § 404.506; *see also Casey v. Berryhill*, No. 15-2810, -- F.3d --, 2017 WL 398309, at *6 (7th Cir. Jan. 30, 2017). In determining whether a person is without fault in causing overpayment of benefits, the ALJ must "specifically take into account any physical, mental, educational, or linguistic limitation such individual may have ...." *Wilkening v. Barnhart*, 139 F. App'x. 715, 719 (7th Cir. 2005), *quoting* 42 U.S.C. § 404(b)(2). While the SSA has the burden of proving the overpayment exists, the recipient has the burden of showing she is entitled to a waiver of repayment. *Begoun v. Astrue*, No. 09 C 1555, 2011 WL 307375, at *8 (N.D. Ill. Jan. 28, 2011).

Ms. Cargile asserts that the ALJ's December 11, 2015 decision should be remanded because plaintiff should not be found "at fault" for causing the overpayment of benefits, and requiring repayment would defeat the purposes of the SSA. The Court agrees that the ALJ failed to build a logical bridge between the evidence in the record and her determination that Ms. Cargile was at fault in causing the overpayment.

## A.

An individual is at fault for overpayment when the overpayment resulted from either: "(a) An incorrect statement made by the individual which [s]he knew or should have known to be incorrect; or (b) Failure to furnish information which [s]he knew or should have known to be

material; or, (c) With respect to the overpaid individual only, acceptance of a payment which [s]he either knew or could have been expected to know was incorrect." *Wilkening*, 139 F. App'x at 719, *citing* 20 C.F.R. § 404.507. It does not matter if the SSA is also at fault for mistakenly paying benefits to which a recipient is not entitled; if the claimant is at fault under any of the above three categories, then he or she is liable to repay the overpayment. 20 C.F.R. § 404.507; *Kainer-Cargile*, 2013 WL 5587084, at *4.

Additionally, "[t]he decision which must be reached in a fault determination is highly subjective, highly dependent on the interaction between the intentions and state of mind of the claimant and the peculiar circumstances of his situation." *Anderson v. Colvin*, No. 14 C 8366, 2016 WL 1246329, at *5 (N.D. Ill. March 24, 2016) (*citations omitted*); *Piskorek v. Colvin*, 13 CV 3831, 2014 WL 5152565, at *7 (N.D. Ill. Oct. 7, 2014) (*citations omitted*); *Begoun v. Astrue*, 09 C 1555, 2011 WL 307375, at *7 (N.D. Ill. Jan. 28, 2011). When determining fault, "the ALJ must 'specifically take into account any physical, mental, educational, or linguistic limitation such individual may have (including any lack of facility with the English language).'" *Wilkening*, 139 F. App'x at 719, *quoting* 42 U.S.C. § 404(b).

The Court finds the ALJ's December 11, 2015 decision must be remanded for numerous reasons. *First*, recognizing that the fault determination "is highly subjective" and dependent on a plaintiff's state of mind, we note that in this case all of the subjective evidence in the record points to plaintiff having no knowledge of the duty to report work activity prior to 2006. *Anderson*, 2016 WL 1246329, at *5 (*citations omitted*); *Piskorek*, 2014 WL 5152565, at *7 (*citations omitted*); *Begoun*, 2011 WL 307375, at *7. As recognized by the ALJ, plaintiff consistently testified that she thought she was obligated only to report when she was married (R. 152). This subjective belief regarding her reporting duties is also consistent with what plaintiff

communicated to SSA employees (R. 14-18, 118, 415-416). We recognize that during a call in late 2006, SSA representative, Ms. Faulkner, informed plaintiff that her monthly earnings were the relevant factor. But, that was at the end of the overpayment period and says nothing about what plaintiff should have known in 2001. And, during a November 7, 2006 call, SSA representative, Lillian, told Ms. Cargile that her benefits were not being suspended and that nothing "need[ed] to be straightened out" with regard to her benefits.

*Second*, the Court finds the ALJ erred by determining that there is no objective evidence that supports plaintiff's consistent testimony that she had no knowledge of a duty to report work activity. As the ALJ noted, people in overpayment cases generally receive annual forms to fill out that specifically ask whether the claimant is working (R. 422). However, there is no evidence that any such form was ever sent to plaintiff, and none of the letters sent to plaintiff between November 2001 and November 2003 provided notice that she was to report work activity to the SSA (R. 33-45). Further, even if plaintiff should have known of the need to inform the SSA of her earnings, the ALJ failed to account for the testimony by plaintiff and her husband that they believed the SSA had that information because the IRS had it. The SSA's letter dated November 1, 2001—stating that the SSA "increased the benefit amount on your own record because you had additional earnings"—and the November 2, 2003 letter—stating that her monthly benefits were raised to give her credit for her "earnings"—are objective evidence that would support their testimony (R. 33, 43, 127-128, 130-131). *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012) (while an ALJ need not mention every piece of evidence in her decision, she cannot ignore evidence that is contrary to her opinion). *See also Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (ALJs must consider all relevant evidence and may not "cherry-pick" the evidence by citing only that which supports her determination while ignoring evidence contrary thereto).

*Third*, we question the ALJ's reliance on wording in the form agreement plaintiff signed when first applying for social security benefits in 1997 as the basis for finding that plaintiff was informed of her duty to report work activity before she was notified of the overpayment. As noted in *Piskorek*, 2014 WL 5152565, at *8, under this logic, no one who signed either a DAC or DIB application form agreement and received benefits could ever be found to be "without fault" for any overpayment, which "cannot be the case and is not what the regulations provide."

*Fourth*, the Court finds the ALJ's reliance on the Ticket to Work letter misplaced. The issue is whether plaintiff knew or should have known of a duty to report her work activity to the SSA, and the ALJ here found plaintiff should have known of that duty as of 2001. However, the Ticket to Work letter cannot support plaintiff's knowledge of a duty to report work activity as of 2001 because the letter was dated April 14, 2006, at the end of the overpayment period that spanned from July 2001 to October 2006.[8]

In remanding, we do not direct a finding that Ms. Cargile was not at fault. That determination will be made by the ALJ, mindful of the direction provided by this decision.

**B.**

On remand, if Ms. Cargile is found not at fault, the ALJ also must consider whether recovery of the $66,535.50 overpayment either defeats the purpose of the Social Security Act or goes against equity and good conscience. *See* 42 U.S.C. § 404(b)(1); 20 C.F.R. § 404.506; *Casey*, 2017 WL 398309, at *6. Requiring repayment would "defeat the purpose of Title II" if it would "deprive a person of income required for ordinary and necessary living expenses," including fixed living expenses such as food and clothing, mortgage payments, utilities, maintenance, insurance, taxes, and installment payments. 20 C.F.R. § 404.508(a).

---

[8]As set forth in plaintiff's brief, the Court notes that the letter dated April 14, 2006 is file stamped that it was received March 28, 2007, subsequent to the written notice of overpayment dated November 20, 2006 (R. 47).

In the final paragraph of the decision, the ALJ noted that on her financial statement Ms. Cargile reported monthly income of $6,730.46 and expenses of $7,206.28. The ALJ stated that "[b]ased on this report expenses appear to currently exceed income" (R. 154). However, the ALJ found that based on plaintiff's testimony that she could possibly repay $50.00 a month, "it appears reasonable that adjustments to her monthly spending could support at least a monthly payment of $50.00" (*Id.*). Under the regulations, recovery of an overpayment defeats the purposes of Title II "where the person from whom the recovery is sought needs substantially all of his current income ... to meet current ordinary and necessary living expenses." 20 C.F.R. § 404.508(b). On remand, if Ms. Cargile is found without fault for the overpayment, the ALJ must still explain how repayment would not defeat the purpose of Title II if the evidence continues to establish that the Cargiles' monthly expenses are greater than their monthly net income (R 328-333).[9]

## CONCLUSION

For the foregoing reasons, plaintiff's request for summary judgment (doc. # 15) is granted and defendant's motion for summary judgment (doc. # 22) is denied. The case is remanded for further proceedings consistent with this opinion. This case is terminated.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATE: April 11, 2017**

---

[9]Repayment of an overpayment will be against equity and good conscience if the individual either: (1) changed her position for the worse or (2) relinquished a valuable right because of reliance on a notice that a payment would be made or because of the overpayment itself or (3) was living in a separate household from the overpaid person at the time of the overpayment and did not receive the overpayment. 20 C.F.R. § 404.509(a). Ms. Cargile did not argue that any of these factors would apply to her case.